J. MOTT SMITH *et al.*, Trustees of Lunalilo Estate *vs.*
S. G. WILDER, Minister of Interior.

IN EQUITY.    BEFORE JUDD, J.

FEBRUARY, 1879.

The dedication by a church of a portion of its land, for a Royal Mausoleum, held to be of such a character that it ought not to be revoked or interfered with.

The mausoleum held to be property of the trustees under the will authorizing its erection: and the Minister of Interior has no right to its possession, notwithstanding the Legislature have made an appropriation for pay of a keeper of the mausoleum: the Government is under no obligation to care for the property, as it does not belong to the state.

DECISION OF JUDD, J.

This is a bill in equity to determine the right of possession, care and control of the mausoleum which was erected in 1875, the Stone Church standing in Kawaiahao, in Honolulu," and which now contains the remains of His late Majesty Lunalilo.

The churchyard in question was conveyed by deed of King Kamehameha III. and his Kuhina Nui, Kekauluohi, dated the 21st day of July, A.D., 1842. It is entitled "The conveyance of the Stone Church standing in Kawaiahao, in Honolulu," and grants the building and premises to the members of that church so long as they adhere to the religious creed which is given in full in the deed. This deed was confirmed by the "Board of Commissioners to Quiet Land Titles" on the 22d January, A.D., 1849, by Award on Claim No. 635, which awards "the premises to the members of the first church of Honolulu, to have and to hold the same to them and their successors upon the terms and conditions set forth in the before-mentioned deed, or in other words, so long as they shall continue to exist as a church and sustain their present faith."

On the 19th September, 1874, on the request of the executor of the will of His late Majesty, the executive committee of the

Kawaiahao Church dedicated and set apart a site for the erection of this mausoleum, on the western side of the churchyard, which action was, on the 26th September, ratified and adopted by the Board of Lunas, or church officers, and the report of the executive committee ordered engrossed on the church records. The dedication thus formally made would estop the Kawaiahao Church from revoking the dedication and from making any other disposition of this ground, so long as it continued to be used as the site for the Lunalilo Mausoleum.

I quote from *Hunter vs. Trustees of Sandy Hill,* 6 Hill, 411: "Land may be dedicated to pious and charitable purposes, as well as for public ways, commons and other easements in the nature of ways, so as to conclude the owner who makes the dedication. Dedication, as the term is used in reference to this subject, is the act of devoting or giving property for some proper object, and in such a manner as to conclude the owner.

"The law which governs such cases is anomalous. Ordinarily, some conveyance or written instrument is required to transmit a right to real property; but the law applicable to dedications is different. A dedication may be made without writing; by act *in pais,* as well as by deed.

"It is not at all necessary that the owner should part with the title which he has, for dedication has respect to the possession, and not the permanent estate. Its effect is not to deprive a party of title to his land, but to estop him while the dedication continues in force from asserting that right of exclusive possession and enjoyment which the owner of property ordinarily has."

See also *Cincinnati vs. Lessees of White,* 6 Peters, 431; *Commonwealth vs. Viall,* 2 Allen, 514.

The dedication of this land for the erection of a Royal Mausoleum may be considered as a dedication if not to a *quasi* public use, certainly to a purpose, the character of which, as a resting place for the dead, entitles that it should be sacredly preserved and hallowed.

According to common law in cases of ordinary interments in

the ground, the heir has no property in the bodies or ashes of his ancestors, and he cannot sustain an action against such as disturb the remains, but as the body after burial becomes a part of the ground where it was committed, "earth to earth, ashes to ashes, dust to dust," the person who has the freehold of the soil can bring an action of trespass *quare clausum fregit*, against those who disturb or disinter it; and any person who has the actual possession of the land may sustain this action against a wrong doer. 2 Blackstone's Com., 429; *Meagher vs. Driscoll*, 99 Mass., 281; *Barnstable vs. Thatcher*, 3 Met., 243.

But where the owner of the freehold of the cemetery has, by a deed, conferred a right to the exclusive occupation of a particular lot in a cemetery, such grantee may maintain an action for trespass on the particular lot. See 99 Mass., 284.

Blackstone says further, that "other personal chattels there are, which also descend to the heir in the nature of heirlooms, as a monument or tombstone in a church, or the coat-armor of his ancestor there hung up, with the pennons and other ensigns of honor suited to his degree. In this case, albeit the freehold of the church is in the parson, and these are annexed to that freehold, yet cannot the parson or any other take them away or deface them, but is liable to an action from the heir." 2 Bl. Com., 429.

The facts of the case before us are quite different, and therefore the above principles of law are inapplicable.

The body of His late Majesty was not interred in the ground, nor was it placed in a church with a monument or tomb erected over it, or affixed to the walls or floor of the church, but it was placed in a separate mausoleum erected by the executor of the will, in accordance with his plain directions, in the Kawaiahao churchyard in Honolulu.

By directing the "suitable tomb" to be erected for the reception of his own and his father's remains, the royal testator contemplated the expenditure of a considerable sum of money from his estate; for a "suitable tomb" must mean a tomb suitable for the interment of one of Hawaii's kings in the condition of

this one as to lands and fortune, and that it would be, when built, a permanent structure affixed to the soil.

I think also that the testator must have contemplated that his tomb would, according to the custom of this Kingdom, need a custodian as well as repairs in course of time. Now, when he made the disposition of all his real estate to trustees for a charitable purpose, he had a right to assume that when the time came (on the death of his father) for the appointment of the trustees, this tomb would be built and that it would form part of his estate. That the tomb itself, on land dedicated upon a formal record by the holders of the freehold to this purpose, is a part of the estate of His late Majesty, I have no doubt. And though there are no specific words in the will, vesting it in the trustees or authorizing them to expend money in keeping it in repair, I am of the opinion that it was the intention of the testator that his trustees should have that authority.

In 2 Perry on Trusts, §477, a citation is made from 2 Hare, 145, in which it was held, "where a fund was directed to be laid out in land, and there was already a settled estate to the same uses, it might be more beneficial to apply part of the fund to prevent buildings on the settled estate from going to destruction than to apply the whole fund to the purchase of new lands, but it would be an extraordinary case which would move the Court to create an exception."

And *ibid* Sec. 478, "Superintendents of public works and similar *quasi* trustees may apply the funds under their control in opposing legislation which would operate injuriously to the interests confided in them. Lord Cottenham said that 'every trustee is to be allowed the reasonable and proper expenses incurred in protecting the property committed to his care.'"

His Majesty Lunalilo having disposed of all his property, real and personal, by will, his heirs at law have no interest in this matter. The Kawaiahao Church have, by dedication, consented to the use of a portion of their freehold for this mausoleum; it has no funds which can be used for its care and maintenance; it is under no legal or moral obligations to sustain this mauso-

leum; it has therefore no further interest in it so long as the site is kept for the purposes for which it was dedicated.

The claim of the Minister of the Interior now remains to be considered. It is quite plain from the will that the testator wished his remains to be kept free from state control. If he wished otherwise, he would not have provided a special tomb for himself, and his remains then would have reposed in the state mausoleum. But it is said that the grant of the Legislature of $400 "for pay of keeper of Lunalilo's tomb" for two years, implies the right of the Minister of the Interior, who is the dispenser of this fund, to the possession of the tomb. But this grant was purely a voluntary one on the part of the Legislature for services to be rendered, and the Government is not bound to draw and expend it, as it would be if this sum was voted in fulfilment of some prior obligation or contract on the part of the Government. If the Government should ascertain that the services of a keeper were not needed, or that his pay was otherwise provided for, it would be under no obligation to draw or expend the money.

This mausoleum not being state property, the Government is under no obligation to care for it, and the Government's act in taking possession of it cannot be justified. As, in my opinion, the intention of the testator will be better carried out by the possession of this tomb remaining in the trustees of his real estate, I therefore grant the prayer of the bill, and decree accordingly.

*Messrs. Dole & Hartwell,* for complainants.

. *Attorney-General Preston,* for respondent.

Honolulu, February 21, 1879.